**IOWA SUPREME COURT BOARD OF PROFESSIONAL ETHICS AND CONDUCT, Complainant,**

**v.**

**Ronald F. EICH, Respondent.**

No. 02–0730.

Supreme Court of Iowa.

Oct. 9, 2002.

Norman G. Bastemeyer and David J. Grace, Des Moines, for complainant.

Mark McCormick of Belin Lamson McCormick Zumbach Flynn, A P.C., Des Moines, for respondent.

LARSON, Justice.

This is a review of a report by our disciplinary commission concerning the license of the respondent, Ronald F. Eich. *See* Iowa Ct. R. 35.10(1). We agree with the findings of fact by the commission and its recommendation for discipline. We order the suspension of the respondent's license for sixty days.

## I. *Principles of Review.*

Iowa Court Rule 35.10(1) directs that within fourteen days after a disciplinary commission report is filed with the clerk of this court, the clerk of the commission shall furnish the entire record. If no appeal is taken or application for permission to appeal is filed within ten days, we will review the matter de novo on the record made before the commission without oral argument or further notice to the parties. On review we may adopt, increase, or reduce the sanction recommended by the commission.

■ The Board of Professional Ethics and Conduct, as the complainant, must prove the allegations of its complaint by a convincing preponderance of the evidence. *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Postma,* 555 N.W.2d 680, 681 (Iowa 1996).

## II. *The Facts.*

Ronald Eich has practiced law in Carroll since 1970. At the time of the commission hearing, he was fifty-nine. He described his practice as largely an office practice, "an extensive income tax practice, probate, . . . some bankruptcy work, real estate and [involvement] in the rest of the stuff, divorces, and a little bit of everything."

This proceeding involves the respondent's representation of members of a family named Pearson. The respondent drafted wills for Frank Hilding Pearson (Hilding) and Hilding's sister, Martha Pearson, in 1990. Both Pearsons were unmarried without children. In 1991 another brother, "Bert" Pearson, and Bert's son, Andy, talked to Eich about conservatorships and guardianships for both Hilding and Martha, who were both very elderly. A voluntary conservatorship petition was signed by Hilding. An involuntary conservatorship was proposed for Martha. Bert and Andy were to be conservators for both Hilding and Martha. Apparently on the same day the applications for appointment were drafted, Bert and Andy signed court officer deeds conveying Hilding's and Martha's land to the conservators. Andy candidly testified at the commission hearing that the transfer was motivated at least in part to deplete Hilding's and Martha's assets for purposes of making them eligible for Title XIX benefits. At the time the deeds were signed purporting to convey title from the conservatorships, the conservatorships had not even been officially opened. The respondent testified it was not his idea for the conservators to transfer title to themselves.

Shortly after the applications for appointment of conservators and the deeds were drafted, Bert, who was one of the proposed conservators, died. The conservatorship for Hilding proceeded with Andy as the sole conservator. Andy filed an inventory in the conservatorship, showing Hilding's one-half interest in eighty acres of land, which Andy valued at $40,000. Andy pressed to get title to Hilding's one-half interest, and the respondent drafted a real estate contract to accomplish the transfer. The contract provided a sale price of $40,000 with no down payment and no interest. Although the respondent drafted the contract, he doubted its legal

effectiveness because it was unlikely a court would approve it in view of its unsatisfactory terms as to the ward. (Disapproval by the court was almost assured; a later appraisal set the value of the eighty acres at $152,000—or $76,000 for Hilding's undivided half interest.)

Under the proposed transfer, Andy was to acquire title by applying rental payments from the land (to which the ward was already entitled) to buy the land from the ward. Eich, however, did not advise Andy of the problems in the proposed transfer. In fact, he drafted a court officer deed to complete the transfer and, again, failed to submit it to the court in the conservatorship for approval. Nevertheless, the deed was recorded on June 26, 1992.

Hilding Pearson died on April 12, 1994. Eich drafted a final report in the conservatorship, stating that Andy, as "executor" of Hilding's estate, had received all of the assets of the conservatorship. Eich obtained an order approving the final report, which found that the executor of Hilding's estate received the conservatorship assets, although in fact no estate for Hilding had even been opened. This was in 1995.

In 1998 the problems in the conservatorship "transfer" surfaced when Andy attempted to use the land he thought he owned for security for a loan. The abstract showed no court approval for the sale. Eich said he would cure the problem by opening an estate for Hilding, but the necessary papers that Andy had signed were never filed.

Meanwhile, Martha Pearson, Hilding's sister and the owner of the other half of the eighty-acre farm, needed help because of her declining health. Eich drafted a court officer deed from the Martha Pearson "conservatorship" to Andy conveying Martha's half interest to Andy. However, no conservatorship had even been opened.

Andy, displeased with Eich's representation, hired an Omaha lawyer, Richard D. Myers, who wrote to Eich on March 19, 1999, requesting the immediate completion of the probate matters. In September 1999 Myers referred the matter to a Council Bluffs lawyer, Jack Ruesch, to contact Eich about the conservatorship and estate matters. Ruesch pointed out to Eich that the statute of limitations on admitting Hilding's will to probate had expired, and it could not be probated. The court officer deed from Martha's nonexistent "conservatorship" was also a problem raised by attorney Ruesch.

Andy's father, Bert, had died on June 22, 1991, and the Iowa Department of Revenue and Finance was pursuing Andy, as executor, for approximately $29,000 in inheritance tax, interest, and penalties. Eich had failed to complete and file the inheritance tax return or pay the tax. (Andy, in his commission testimony, assumed some of the blame for the inheritance tax problem because he had insisted, erroneously, that his father's estate would not be subject to Iowa inheritance tax because the beneficiary was a resident of Nebraska.)

Attorney Ruesch took over the probate matters, including payment of the inheritance tax. Penalty and interest had accrued, and at Ruesch's request, Eich sent a check to cover them. As of the time of the commission hearing, Ruesch testified he thought it might be necessary to file a quiet title action to clear title to the farm.

### III. *The Complaint.*

■ The Board alleges the breach of several canons under our Code of Professional Responsibility. It alleges a violation of Canon 1 (lawyers to assist in maintaining integrity and competency of the legal profession); Canon 6 (lawyers should rep-

resent clients competently); and Canon 7 (lawyers should represent clients zealously within the bounds of the law).

We agree with the commission that the respondent violated DR 6–101(A)(3) (neglect of a client's matter): (1) failing to establish a conservatorship for Martha Pearson and failing to file a timely inheritance tax return in her estate, (2) failing to initiate estate proceedings for Hilding Pearson, (3) failing to file a timely inheritance tax return in Bert's estate, and (4) failing to respond to the revenue department's repeated inquiries about it. We agree with the commission's conclusion that the Board failed to prove a violation of DR 1–102(A)(4) regarding fraud and misrepresentations. However, Eich's drafting of the receipt and waiver in Hilding's conservatorship, which purported to receipt for all assets in the conservatorship by the estate, when no estate had even been opened for Hilding, amounted to a violation of DR 7–102(A)(3) (failure to disclose information required to be disclosed).

## IV. *Disposition.*

This respondent has been publicly reprimanded three times for conduct that parallels the present case. In 1986 he was reprimanded for "failing to make timely filings in a probate matter, ... failure to remove a delinquency after receiving notice thereof, and ... failure to respond to notice of complaint." In 1988 he was reprimanded "for neglecting to make a timely application to modify a dissolution decree, in dismissing that application without consulting with [his] client, and ... failure to advise the client of that action." In 1991 he was reprimanded for receiving a probate fee by withholding it from a disbursement to the executor, prior to court approval, and in an amount beyond that ultimately allowed by the court. We consider prior disciplinary matters as aggra-

vating circumstances in determining the appropriate sanction. *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Gonnerman,* 601 N.W.2d 34, 35 (Iowa 1999); *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Mattson,* 558 N.W.2d 193, 195 (Iowa 1997).

On the other hand, lawyers from Eich's community attested to his honesty, hard work, and general competence. Also a mitigating, but not excusing, circumstance here is that Eich was dealing with a headstrong client, Andy Pearson, who insisted that Eich draft papers in the Hilding Pearson estate under circumstances that Eich knew would not be approved by the court. This was at least part of the reason, we believe, the papers were never submitted to the court for approval. Andy also insisted his father's estate was not subject to Iowa inheritance tax, and Eich chose not to confront him on this issue, although Eich believed Andy was wrong. Despite pressure from his client, Eich had a professional duty to properly pursue these matters, and if Andy could not be persuaded to allow Eich to properly complete the matters entrusted to him, Eich should have asked to be relieved of his responsibility. He should not have simply pursued the strategy of his client.

 This case is one largely involving neglect of legal matters. As we have said, "[i]n respect to matters of neglect, each case must obviously be treated individually, and precedents are of little value." *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Bitter,* 279 N.W.2d 521, 524 (Iowa 1979). However, we have noted that, while there is no prescribed sanction in disciplinary cases, "when neglect of a client's legal matters is the principal violation, 'discipline generally ranges from a public reprimand to a six-month suspension.'" *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Grotewold,* 642

N.W.2d 288, 294 (Iowa 2002) (quoting *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Hohenadel*, 634 N.W.2d 652, 655 (Iowa 2001)).

In *Gonnerman* the respondent had failed to properly administer an estate, failed to respond to twelve notices of delinquency by the clerk of the district court, and failed to respond to seven letters of inquiry sent by the Board. He also had been reprimanded once previously. We suspended his license for a minimum of one month. *Gonnerman*, 601 N.W.2d at 35.

In *Iowa Supreme Court Board of Professional Ethics & Conduct v. Fleming*, 602 N.W.2d 340 (Iowa 1999), the respondent had mishandled two estates, including taking fees without court approval, which resulted in financial loss to the beneficiaries. He also failed to cooperate in the Board's investigation. We suspended his license for a minimum of six months, based in part on the fact he had been publicly reprimanded twice before. *Fleming*, 602 N.W.2d at 342.

In *Iowa Supreme Court Board of Professional Ethics & Conduct v. Freeman*, 603 N.W.2d 600 (Iowa 1999), the respondent had failed to properly handle a guardianship and conservatorship for a ward, failed to properly handle an estate, and failed to act in time to prevent the running of a statute of limitations in a discrimination case. He also failed to cooperate with the Board. He had no prior disciplinary sanctions. We suspended his license for a minimum of three months. *Freeman*, 603 N.W.2d at 605.

In *Iowa Supreme Court Board of Professional Ethics & Conduct v. Jay*, 606 N.W.2d 1 (Iowa 2000), the respondent neglected an estate, collected fees prematurely, and misrepresented the status of the proceedings to the court. Aggravating circumstances included the respondent's persistent refusal to honor court orders with respect to the estate, causing financial prejudice to the distributees, a prior sixty-day suspension, and a prior reprimand. We suspended his license for a minimum of one year. *Jay*, 606 N.W.2d at 4.

In *Grotewold* the respondent had seriously neglected an estate and misrepresented its status to the court. *Grotewold*, 642 N.W.2d at 293. We suspended his license for sixty days. *Id.* at 296.

In view of the usual range of discipline in neglect cases (reprimand to six-month suspension, *Grotewold*, 642 N.W.2d at 294), the nature of the respondent's violations, his prior discipline, and the recommendation of the commission, we suspend the respondent's license for sixty days.[1] This suspension applies to all aspects of the practice of law. Iowa Ct. R. 35.12(3). Reinstatement is governed by the automatic reinstatement provisions of Iowa Court Rule 35.13. Costs are taxed to the respondent pursuant to Iowa Court Rule 35.25.

## LICENSE SUSPENDED.

---

1. The respondent suggests that in lieu of suspension we publicly reprimand him and order him to perform community service as we did in *Iowa Supreme Court Board of Professional Ethics & Conduct v. Huisinga*, 642 N.W.2d 283 (Iowa 2002). However, in *Huisinga* the respondent had "previously enjoyed an unblemished record of service to his profession and his community." *Id.* at 288. In contrast this respondent has been reprimanded three times. We believe another reprimand, even coupled with a requirement for public service, is not an adequate sanction.